IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TIMOTHY BRIGGS, | CASE NO. 1:22-cv-803 |
| Plaintiff, | DISTRICT JUDGE PAMELA A. BARKER |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | REPORT & RECOMMENDATION |

Plaintiff Timothy Briggs filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court reverse the Commissioner's decision and remand for proceedings consistent with this opinion.

**Procedural history**

In November 2019, Briggs filed an application for Disability Insurance Benefits alleging a disability onset date of October 25, 2019,[1] and claiming he

---

[1] "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

was disabled due to multiple sclerosis, hypertension, hypothyroidism, chronic idiopathic gout at multiple sites, coronary artery disease, antalgic gait, hyperlipidemia, osteoarthritis, and vitamin D deficiency. Tr. 159, 199. The Social Security Administration denied Briggs's application and his motion for reconsideration. Tr. 73, 83. Briggs then requested a hearing before an Administrative Law Judge (ALJ). Tr. 103.

In January 2021, an ALJ held a hearing. Briggs and a vocational expert testified. Tr. 31–76. In March 2021, the ALJ issued a written decision finding that Briggs was not disabled. Tr. 15–25. The ALJ's decision became final on March 18, 2022, when the Social Security Appeals Council declined further review. Tr. 1-3; *see* 20 C.F.R. § 404.981.

Briggs filed this action on May 17, 2022. Doc. 1. He asserts the following assignments of error:

> 1. The ALJ's determined RFC did not include a need for forearm crutches, nor did his decision include any explanation about the medical necessity for these prescribed ambulatory aids. Therefore, his determined RFC is not substantially supported and his reliance on the VE testimony was in error.

> 2. The ALJ's finding that Plaintiff retains the residual functional capacity to perform past relevant work as a Clergy Member is not supported by substantial evidence because Plaintiff's work as a Clergy Member does not constitute past relevant work, and because the ALJ misstated components of the VE's testimony.

Doc. 8, at 1.

**Evidence**

*1.    Personal and vocational evidence*

Briggs was born in 1959 and was 60 years old on the alleged disability onset date. Tr. 159. He has a twelfth-grade education. Tr. 40. Since 2015, he worked part-time as a "pulpit preacher." Tr. 81. He used to work as a toolmaker but stopped performing that work in 2019. Tr. 81.

*2.    Medical evidence[2]*

In September 2019, Briggs visited his primary care office for a follow up for multiple sclerosis. Tr. 272. Briggs said that he was concerned about the upcoming closure of the plant where he worked. Tr. 272. He explained that his employer made allowances for him and he was concerned about applying for a new job. Tr. 272. Briggs reported having trouble with balance and difficulty walking straight. Tr. 272. He had to "make slow turns" and his feet would "get tangled." Tr. 272. He had not fallen down. Tr. 272. Upon exam, Briggs had a "significant limp, left leg" and lost his balance "trying to stand on tiptoe." Tr. 275.

In February 2020, Briggs saw his family physician, William Lago, M.D. Tr. 341. Briggs reported "balance issues," "gout issues," and intermittent foot pain. Tr. 341. He had "issues with walking" and "difficulty using [a] cane at times." Tr. 341. Dr. Lago wrote that Briggs was overdue for a follow-up with

---

[2]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

3

rheumatology, who had expected him in 2017, and with the Mellen Center, for multiple sclerosis. Tr. 341. Dr. Lago's exam findings showed that Briggs's gait was "broad based and flat footed" and Briggs didn't use an assistive device in the exam room. Tr. 344. In his assessment list, Dr. Lagos wrote that Briggs "is using forearm crutches" and "reinforced [the] need to see neurology." Tr. 344. Dr. Lagos also stated that Briggs should follow-up with neurology and rheumatology for his gout and ataxia. Tr. 344. Under each assessment— multiple sclerosis, gout, ataxia—Dr. Lagos wrote, "crutch, forearm." Tr. 344.

Later that month, Briggs had a functional capacity evaluation. Tr. 326. He had a "visible flare of right hand with increased edema around fingers and joints likely secondary to gout." Tr. 327. He reported constant pain from multiple sclerosis and gout. Tr. 320. He said that he quit his job due to "increased symptoms." Tr. 321. Briggs stated that he lived in a two-story home with 13 steps and a handrail between the levels. Tr. 321. He completed his self-care tasks independently, prepared simple meals, drove, and performed general tasks around the home. Tr. 321. The examiner observed that Briggs had hand tremors and was unable to make "full composite fist[s]." Tr. 330. Briggs had mechanical deficits in his right hand and compensated by using his shoulder more. Tr. 332. Testing showed that his "static balance [wa]s intact." Tr. 332. Briggs's gait was "slight[ly] antalgic ... to right side with lateral swing of left lower extremity." Tr. 334. The evaluator concluded that Briggs could lift 20 pounds occasionally and 10 pounds frequently at the floor and knee level;

15 pounds occasionally at the waist and shoulder level; and 10 pounds occasionally overhead. Tr. 326. He could frequently sit and stand and occasionally walk. Tr. 327.

Around the same time, Dr. Lago completed medical source statements on Briggs's behalf. Tr. 350-53, 367. Dr. Lago checked boxes on the forms indicating that Briggs's symptoms frequently interfere with Briggs's ability to maintain attention and concentration for simple work tasks and that Briggs would miss more than 4 days of work per month. Tr. 351, 353, 367. Dr. Lago didn't complete the physical functional limitations part of the forms. Instead, Dr. Lago referred to Briggs's functional capacity evaluation findings. Tr. 351, 367.

In June 2020, Briggs visited his orthopedist's office and saw Certified Nurse Practitioner Carrie Hancock. Tr. 368. Briggs reported hip and knee pain for the past year. Tr. 368. Hancock's exam findings showed that Briggs had tenderness in his left knee, tenderness and reduced range of motion in his lumbar spine, and tenderness and reduced range of motion in his hips. Tr. 371–72. He had positive straight leg raise testing.[3] Tr. 372. Hancock reviewed Briggs's lumbar, pelvic, and left knee imaging and offered Briggs a cortisone injection for his left knee. Tr. 372. Briggs declined, stating that his knee wasn't

---

[3]    In a straight leg-raising test, the patient lies down, fully extends the knee, and lifts the leg. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1900. Leg pain when raising the leg 30–90 degrees is a positive test and indicates lumbar radiculopathy. *Id*.

that painful. Tr. 372. Hancock referred Briggs to physical therapy for his back and knee. Tr. 372.

In early August 2020, Briggs visited the Mellen Center for Multiple Sclerosis to re-establish care and saw Physician's Assistant Shauna Gales. Tr. 479. Briggs hadn't been to the center in 2 years. Tr. 479. He reported an "overall feeling [of] general decline." Tr. 479. He reported 7-hour episodes where he was unable to move his left hand. Tr. 479. He said that he occasionally used a cane when his gout flared up in his feet and made walking painful. Tr. 479. He completed his activities of daily living independently. Tr. 479. Briggs said that his balance was poor and his gait was "slowing down quite a bit." Tr. 480. He attributed his imbalance to chronic back pain. Tr. 480. Briggs's exam showed reduced strength in his hands and calf muscles. Tr. 483. Briggs's standing balance was impaired and Briggs's gait was "paretic, unsteady.[4] Assistive device: independent." Tr. 483. Gales ordered updated MRI imaging and referred Briggs to physical therapy for gait, balance, stretching, and strengthening. Tr. 483–84. Updated MRIs showed "stable changes of multiple sclerosis." Tr. 489.

In mid-August 2020, Briggs had his first physical therapy session. Tr. 505. Briggs's history lists falls, impaired transfers, impaired gait, chronic pain, decreased right knee range of motion, lower extremity weakness, and impaired

---

[4]    "Paretic" is an adjective of "paresis," which is a "slight or incomplete paralysis." See Dorland's, supra, at 1383.

balance. Tr. 505. Briggs stated that his balance had worsened the last few years and he felt weaker. Tr. 506. He reported daily "near falls"— falling into objects but not to the floor. Tr. 506. He used a forearm crutch "for gout." Tr. 506. He had balance issues when walking, especially when someone was next to him. Tr. 506. During Briggs's assessment, Briggs's gait was "supervised" and he didn't use an assistive device. Tr. 508.

At a physical therapy session a week later, Briggs reported that while he was standing at Walmart, he began to lean, took a few staggering steps, and caught himself on a shelf. Tr. 512. He said that kind of thing happens at least once or twice a day, especially when he first stands up or begins to walk. Tr. 512. He was using his forearm crutch at home more, which "seem[ed] to help." Tr. 512.

In late August 2020, Briggs reported for a blood pressure check. Tr. 517. His gait was normal. Tr. 519.

Two days later, Briggs had a virtual follow-up visit with Gales at the Mellen Center for multiple sclerosis. Tr. 523. Briggs stated that he was occasionally using a cane, per his physical therapist's instructions that he use a cane inside his house. Tr. 523. Gales reviewed Briggs's recent imaging results and encouraged Briggs to continue physical therapy. Tr. 526. The same day, Briggs had his third physical therapy appointment. Tr. 529. Briggs told his therapist that his doctor "also agreed he should be using [his] device at all times." Tr. 529. Briggs didn't bring his device that day. Tr. 530. The therapist

used "contact guard assistance" when Briggs walked, which means that the therapist placed one or two hands on Briggs's body. Tr. 530.

At Briggs's fourth therapy session, in early September 2020, Briggs reported that his gout was "really bad." Tr. 533. He walked with a forearm crutch and had *contact guard assistance*. Tr. 534. At Briggs's fifth visit, the therapist wrote that Briggs was progressing as expected, with improved transfers and mild balance improvements. Tr. 540. He was still a high fall risk and "continued to be limited with rising from a chair, standing, walking, stair negotiation, heavy exertion and physical activities." Tr. 540.

At Briggs's sixth therapy visit, Briggs reported that he ran into things, but also that he "looked away at times." Tr. 549. The therapist educated Briggs on looking up when walking, rather than down. Tr. 549. Briggs used forearm crutches and the therapist provided *contact guard assistance*. Tr. 550. At Briggs's seventh visit, Briggs reported "lots of losses of balance" but "no full falls." Tr. 553. He used forearm crutches and the therapist provided "stand by assistance," which doesn't include physical contact. Tr. 554.

At Briggs's eighth physical therapy visit in early October 2020, Briggs "was not able to complete all the components of his biodex balance interventions" due to pain and fatigue. Tr. 557. He reported a near fall since his last visit—he was at a soccer game "not holding onto [his] crutches and lost balance into wall." Tr. 557. During Briggs's session, Briggs was weight bearing as tolerated, used his forearm crutches, and had *stand by assistance*. Tr. 558.

8

A week later, at Briggs's ninth and final visit, Briggs showed improvement in leg strength and balance. Tr. 562. He "continue[d] to be limited with rising from a chair, standing, and physical activities." Tr. 562. He was progressing as expected. Tr. 562. The therapist wrote that Briggs would benefit from continued skilled therapy, but that Briggs wished to "address issues with spine via consult to spine [doctor]." Tr. 562. Briggs reported losing his balance "quite a bit since his last visit" but "has not had a fall." Tr. 563. During the session, Briggs was weight bearing as tolerated, used his forearm crutches, and had *stand by assistance*. Tr. 564.

###### 3.    *State agency opinions*[5]

In January 2020, Gerald Klyop, M.D., reviewed Briggs's record and assessed Briggs's residual functional capacity (RFC).[6] Dr. Klyop found that Briggs could lift 20 pounds frequently and 10 pounds occasionally. Tr. 79. In an 8-hour workday, Briggs could stand and walk for 4 hours and sit for about

---

[5]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[6]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

6 hours. Tr. 79. He could frequently climb ramps and stairs but never ladders, ropes, or scaffolds. Tr. 79. He could occasionally balance, stoop, kneel, crouch, and crawl, and needed to avoid all exposure to hazards. Tr. 79–80.

In May 2020, Abraham Mikalov, M.D., reviewed Briggs's record and agreed with Dr. Kylop's findings. Tr. 87–88.

### 4.  *Hearing testimony*

Briggs, who was represented by counsel, testified at the telephonic administrative hearing held in January 2021. Briggs and his wife had 5 children and used to live in a 2-story house with steps, but Briggs could no longer manage the steps. Tr. 40–41. So he and his wife sold the house and bought a one-story condominium. Tr. 40–41. Briggs has a driver's license and "for the most part" doesn't have difficulty driving. Tr. 40. He doesn't drive too far because he "gets tired and stuff." Tr. 40.

Briggs uses forearm crutches to stabilize himself. Tr. 41. He can't use a cane because he's "still wobbly." Tr. 41. The crutches were prescribed for him in summer 2020. Tr. 41. At the time of his alleged disability onset in October 2019, he was not using an assistive device. Tr. 42. He "would stumble and fall." Tr. 42. When he saw his multiple sclerosis doctor, the doctor told him that he "needed to start using something." Tr. 42. Briggs uses forearm crutches to walk in his home.[7] Tr. 42.

---

[7]  Briggs's testimony about whether Briggs uses crutches *to* stand or *when* standing is not clear. Tr. 42.

Briggs works about 4 hours a week as a preacher. Tr. 50. He preaches on Sunday mornings, teaches on Wednesday nights, and studies for a "couple [of] hours" during the week. Tr. 50–51.

When asked to describe his multiple sclerosis condition since October 2019, Briggs stated, "it started before then." Tr. 52. He has problems concentrating—that's why he doesn't want to drive for long, "because [he] just might fall asleep anytime." Tr. 52. He gets extremely tired. Tr. 52. His balance "started to go" around 2018. Tr. 52. He would be standing still, take a few steps, start to fall, and grab onto something. Tr. 52. He had problems "get[ting] up." Tr. 52. If he walks straight, he's "pretty good." Tr. 52. If he turns, "it has to be a gradual turn." Tr. 52. If he tries a 90-degree turn, he may "go another 3 or 4 steps to the side" because he doesn't know where things are. Tr. 52–53. In the summer of 2020, he returned to his doctor's office. Tr. 53. The provider he saw watched him walk and told him to start using an assistive device. Tr. 53. He went to physical therapy—they gave him tests and he "flunked them all." Tr. 53.

When asked if multiple sclerosis caused trouble with his arms, Briggs answered that he can't hold onto anything anymore and he drops stuff all the time. Tr. 53. He has problems grasping, fingering, and reaching. Tr. 53. His hand doesn't go where he wants it to go. Tr. 53. His symptoms are getting worse every day. Tr. 54. He also has worsening arthritis in his backbone and all over his body. Tr. 54. He sees a spine doctor, who gives him shots. Tr. 54. Briggs has

11

a slipped disc pinching his nerves, which causes his legs to go numb and he can't feel them when he walks. Tr. 54.

Briggs has recurrent gout that affects his whole body. Tr. 55. He also has a history of heart attacks, heart surgery, and hip and knee replacements. Tr. 55. He takes medication for his thyroid, diabetes, gout, heart, and blood pressure. Tr. 55–56. At the time of the hearing, he also took a muscle relaxant for his low back arthritis, prednisone for gout flare-ups, and a diuretic, which makes him go to the bathroom every 10 to 15 minutes. Tr. 57.

The ALJ discussed with the vocational expert Briggs's past work as a toolmaker, toolmaker supervisor, and clergy member. Tr. 62–63. The ALJ asked the vocational expert to determine whether a hypothetical individual with Briggs's work experience could perform Briggs's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 63–64. The vocational expert answered that such an individual could not perform the toolmaker jobs but could perform the clergy person job "as it's customarily performed." Tr. 64.

The ALJ asked the vocational expert if his answer would change if the hypothetical individual would need crutches to ambulate, and the vocational expert stated, "I expect that you could probably still preach on crutches." Tr. 65. Then Briggs's attorney asked the vocational expert if the hypothetical individual could perform the clergy job if the individual used crutches for

"static standing and ambulation." Tr. 74. The vocational expert stated that such an individual could not perform the clergy person job. Tr. 70.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024 (Ex. 6D).

2. The claimant has not engaged in substantial gainful activity since October 25, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: history of bilateral hip replacements, gout, hypothyroidism, hyperlipidemia, hypertension, coronary artery disease, and multiple sclerosis (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except stand and/or walk for four hours out of an eight-hour workday. The claimant can frequently use ramps and stairs but never use ladders, ropes, or scaffolds. He can frequently balance and occasionally kneel, stoop, crouch, and crawl. The claimant is restricted from hazards such as heights or machinery but is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles.

6. The claimant is capable of performing past relevant work as a clergy member. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from October 25, 2019, through the date of this decision (20 CFR 404.1520(f)).

Tr. 15–25.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**[8]

Briggs argues that the ALJ erred because he didn't include the need for forearm crutches in his RFC assessment and didn't include "any explanation about the medical necessity for these prescribed ambulatory aids." Doc. 8, at 9.

If an assistive device is "not a necessary device for [a] claimant's use, it cannot be considered an exertional limitation that reduce[s] [the claimant's] ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). To be considered a restriction or limitation, an assistive device "must be so necessary that it would trigger an obligation on the part of the Agency to

---

[8]    The ALJ cited the record by exhibit page number. The Commissioner's transcript does not include adequate exhibit page numbers. For example, when the ALJ cites "Ex. 14F/156," one can't easily scroll to page 156 of Exhibit 14F because Exhibit 14F, which is 246 pages long, doesn't have visible exhibit page numbers. Some pages have the exhibit number stamped on it, but it's in the middle of the page in font so small it's at times indecipherable. *See, e.g.*, Tr. 372, 534, 536, 551, 559. Sometimes that stamp is upside-down and backwards. *See e.g.*, Tr. 227, 342–44. In the future, the Commissioner should take care to file an orderly transcript.

conclude that the [device] is medically necessary." *Murphy v. Astrue*, No. 2:11-cv-114, 2013 WL 829316, at *10 (M.D.Tenn. March 6, 2013) (citations omitted). To be *medically necessary*, the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a[n] [assistive device]." *Id.* (citation omitted).

"If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the V[ocational] E[xpert]" which includes the use of an assistive device. *Murphy*, 2013 WL 829316, at *10 (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). Generally, an ALJ's finding that an assistive device is not *medically necessary* is error when the claimant was prescribed an assistive device and the ALJ didn't include the use of the device in the RFC without providing an explanation for omitting it. *Cruz-Ridol v. Comm'r of Soc. Sec.*, No. 1:17-cv-1075, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018) (citing *Watkins v. Comm'r of Soc. Sec.*, No. 1:16–cv–2643, 2017 WL 6419350, at *11 (N.D. Ohio Nov. 22, 2017)).[9]

 Here, Briggs contends that Dr. Lago prescribed him forearm crutches in February 2020. Doc. 8, at 11 (citing Tr. 344). The Commissioner doesn't dispute that Dr. Lago's treatment note is a prescription for forearm crutches. Doc. 9, at 11. Because the ALJ didn't include the use of Briggs's prescribed

---

[9]     Report and recommendation adopted, No. 1:17-cv-1075, 2018 WL 1083252 (N.D. Ohio Feb. 28, 2018).

forearm crutches in his RFC assessment, the ALJ was required to explain why he omitted them. *See Cruz-Ridolfi*, 2018 WL 1136119, at *15.

The ALJ did not sufficiently explain why he omitted the use of forearm crutches from his RFC assessment. The ALJ stated that in August 2020, when Briggs reestablished care for his multiple sclerosis, he reported using a cane when his gout flared up in his feet and caused pain with walking. Tr. 21. The ALJ acknowledged that Briggs had impaired balance and coordination that day. Tr. 21–22 (citing Tr. 483, showing that Briggs had a "paretic, unsteady" gait). Then the ALJ wrote,

> At times, the claimant used crutches when his gout flared (Exs. 6F/7; 14F/156, 172, 176, 180, 186). However, there were also times he did not use them during his examinations, present with any assistive device, and/or had a normal gait (Exs. 6F/6, 7; 11F/5; 14F/87, 105, 116, 141, 152).

Tr. 22.

Not all the ALJ's record citations support the ALJ's statements. The ALJ's first line of string cites doesn't show that Briggs only used crutches when his gout flared. Exhibit 6F/7 is Tr. 344, which shows that Dr. Lago prescribed forearm crutches for multiple sclerosis, gout, and ataxia. Tr. 344. Exhibit 14F/156 is Tr. 533, which shows that Briggs had increased pain from gout at his physical therapy appointment but doesn't say that his gout was the reason he was using forearm crutches. The remaining citations show that Briggs used forearm crutches while walking during physical therapy sessions but don't say anything about gout. *See* Tr. 550 (Ex. 14F/172), Tr. 554 (Ex. 14F/176), Tr. 558

18

(Ex. 14F/180), Tr. 564 (Ex. 14F/186). The Commissioner concedes that Briggs's gait was described as "unsteady" and admits that "the ALJ did not specifically discuss these [physical therapy] records, or their impact on whether an assistive device or devices was medically necessary." Doc. 9, at 12. The ALJ's finding that Briggs used crutches only when his gout flared is not accurate.

Next, in the second half of the quote above, the ALJ commented that Briggs at times didn't use crutches during examinations. But the records the ALJ cited show a more complicated picture than the ALJ presented. Exhibit 6F/6 and 7 concern a visit with Dr. Lago when Briggs was "[n]ot using assistive device in room," but Briggs had an abnormal gait. And that was the day Dr. Lago prescribed crutches. Tr. 343–44. Exhibit 11F/5 doesn't mention Briggs's gait at all—the provider didn't assess it. Tr. 372. Exhibit 14F/105 shows that Briggs didn't use an assistive device, but he had impaired coordination and balance and a "paretic, unsteady gait." Tr. 483. Exhibit 14F/152 shows that Briggs didn't bring his crutches to a physical therapy visit. Tr. 530. But the therapist provided *contact guard assistance* while Briggs walked. Tr. 530. So Briggs's gait was abnormal enough for the therapist to place her hands on Briggs's body while he walked. Without further explanation—which the ALJ didn't provide—the ALJ's record citations don't support the ALJ's reasoning

that Briggs's lack of an assistive device at some visits meant that a device wasn't *medically necessary*.[10]

> There are other problems with the ALJ's decision. The ALJ concluded:
>
> Overall, the record as a whole contains objective findings related to the claimant's physical impairment but not to the levels alleged. While there was evidence that the claimant had some abnormal[11] and occasionally used an assistive device, he responded well to medication and often had negative physical findings (Exs. 6F/6, 7; 11F/4, 5; 14F/87, 105, 116, 141, 152, 156, 172, 176, 180, 186, 206).

Tr. 22. The ALJ doesn't say what medication Briggs responded well to or explain how that fact led to a conclusion that crutches weren't *medically necessary*. The ALJ's conclusory statement—Briggs "often had negative physical findings"—isn't specific enough, and the string cite of record citations doesn't provide enlightenment.

For instance, the ALJ cited many of the same records as before. Exhibits 6F/6 and 7 show that Briggs had a "broad based and flat footed" gait and was prescribed crutches. Tr. 343–44. Exhibits 11F/4 and 5 show that Briggs had tenderness in his back, knee and hips; decreased range of motion in his lumbar spine; abnormal range of motion and overall decreased strength in both hips; and positive straight leg raise testing. Tr. 371–72. Exhibit 14F/105 shows that Briggs had impaired coordination and balance and an "paretic, unsteady" gait.

---

[10]   The other 3 citations—Exhibit 14F/87, 116, and 141—are Briggs's visits to have his blood pressure checked in August 2020, when his gait was listed as normal. Tr. 465, 494, 519.

[11]   This passage is reproduced as written and has not been edited.

Tr. 483. Exhibit 14F/152 shows that Briggs didn't bring his crutches to a physical therapy appointment and walked with *contact guard assistance*. Tr. 530. Exhibit 14F/156 shows that Briggs presented with increased pain in his elbow and hip from a gout flare-up at a physical therapy appointment. Tr. 533. Exhibit 14F/172 shows that Briggs walked with crutches and had *contact guard assistance*. Tr. 550. Exhibits 14F/176, 180, and 186 show that Briggs waked with crutches and had *stand by assistance*. Tr. 554, 558, 564. He walked with "decreased cadence" and a "flexed trunk posture," Tr. 558, 564, and had reduced strength in his legs, Tr. 564. All told, the ALJ didn't sufficiently support his statement that Briggs "often had negative physical findings." So that statement doesn't support the ALJ's conclusion that Briggs's crutches weren't *medically necessary*.

The Commissioner briefly asserts that any error about the need for crutches that the ALJ may have made is harmless. Doc. 9, at 12. This is so, the Commissioner writes, because "the need to use an assistive device does not necessarily preclude an individual from performing the lifting requirements of sedentary work."[12] *Id*. And *sedentary* work, the Commissioner points out, is

---

[12] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though

how Briggs described the tasks required to do his current, part-time job as a preacher. *Id.* So even though the ALJ's RFC limited Briggs to *light* work, the Commissioner's logic goes, Briggs testified that he performed that work at the *sedentary* level and it is Briggs's ability to perform *sedentary* work that the Court should review. *Id.*

The Commissioner's harmless error argument fails. As an initial matter, the ordinary rule in reviewing agency decisions is that "a reviewing court … must judge the propriety of such [decisions] solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). And "[i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Id.* Instead, "'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

It is nonetheless true that an administrative decision can be reviewed for harmless error if an alleged error clearly did not affect the outcome of the proceeding. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969); *Massachusetts Trustees of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235,

---

the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

247–48 (1964); *see also Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("if an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless 'the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.'") (citation omitted). Here, however, the Commissioner doesn't cite legal authority indicating that the Court should review something other than the ALJ's RFC assessment.

The Commissioner cites Social Security Ruling 96-9p, 1996 WL 374185, at *7 (July 2, 1996), in support of her argument. Doc. 9, at 12. That Ruling is called *Determining Capability to do Other Work-Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work*. But the ALJ's RFC found that Briggs could perform *light* work, not s*edentary* work, so Social Security Ruling 96-9p doesn't apply here.[13] In any event, the Commissioner cites the following portion of Ruling 96-9p:

> Since most unskilled sedentary work requires only occasional
> lifting and carrying of light objects such as ledgers and files and
> a maximum lifting capacity for only 10 pounds, an individual who

---

[13]    Social Security Ruling 96-9p states that its purpose is to "explain the Social Security Administration's policies regarding the impact of a residual functional capacity (RFC) assessment for less than a full range of sedentary work on an individual's ability to do other work." 1996 WL 374185, at *1. So the ruling, by its own definition, applies to the ALJ's RFC assessment, not to the level of work that a claimant may be currently performing. *See also Abraham v. Comm'r of Soc. Sec.*, No. 1:08CV117, 2008 WL 4738333, at *3 (W.D. Mich. Oct. 24, 2008) (agreeing with the Commissioner's assertion that SSR 96–9p "is irrelevant because the ALJ found her capable of performing light work, and SSR 96–9p relates only to claimants who can perform only sedentary work.").

23

> uses a medically required hand-held assistive device *in one hand* may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand….

Doc. 9, at 12 (emphasis added). But Briggs used forearm crutches in *both* hands. Tr. 41, 550, 564. So even if I consider that portion of Ruling 96-9p, the ALJ's error is not harmless.[14]

The Commissioner points out that, upon questioning by the ALJ, the vocational expert testified that Briggs could "probably" perform his past relevant work as a preacher even if he needed crutches to walk.[15] Doc. 9, at 12 n.3; *see* Tr. 65. But upon questioning by Briggs's attorney, the vocational expert said that Briggs *couldn't* perform his past relevant work as a preacher if he needed crutches for "static standing" and walking. Tr. 70. So the vocational expert's testimony does not save the ALJ's error. And I decline the Commissioner's invitation to review Briggs's function report myself, compare

---

[14]    Moreover, the full quotation from that portion of Ruling 96-9p concludes, "On the other hand, the occupational base for an individual who must use … a [one-handed] device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded." SSR 96-9p, 1996 WL 374185, at *7. Here, the ALJ acknowledged that Briggs had a neurological impairment—multiple sclerosis—and impaired balance, Tr. 17, 21, and Briggs testified that he used his crutches for balance. Tr. 41–42. So SSR 96-9p doesn't provide answers—it just raises more questions.

[15]    Although the ALJ asked the vocational expert about "crutches for ambulation," the vocational expert's answer referenced standing. The vocational expert said, "I think typically an individual stands at least part of the day, particularly when up in front of the congregation. And so, you know, I think you could still—you could probably do that and use crutches." Tr. 65.

it to Briggs's testimony, and decide whether I think the use of crutches would have "conflicted with [Briggs's] ability to perform the clergy position." Doc. 9, at 12; *see Lorian*, 470 U.S. at 744 (holding that a "reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry").

I am mindful of the Commissioner's assertion that "courts are not required to 'convert judicial review of agency action into a ping-pong game' where 'remand would be an idle and useless formality.'" Doc. 9, at 13 (citing *Rabbers*, 582 F.3d at 654–55 and *Wyman-Gordon*, 394 U.S. at 766 n.6). But here, the Commissioner asks this Court to disregard the ALJ's error when assessing the RFC as to Briggs's use of crutches, skip past the vocational expert's contradictory testimony about how crutches in the RFC would change the vocational expert's answer, and side-step the ALJ's stated reliance upon the vocational expert's testimony, Tr. 23–25, and land at a place that the Commissioner believes is the correct result: find that Briggs can perform his past relevant work because he is currently performing a lesser version of it. But if the answer were as simple as the Commissioner suggests, one would expect that the ALJ himself would have said so. But the ALJ didn't, and the Commissioner hasn't provided relevant legal authority showing that it's appropriate for this Court to do it for him. *See Chenery*, 332 U.S. at 196.

In sum, the ALJ erred when he didn't include crutches in the RFC or explain why he omitted them. The ALJ's decision contains further errors and

25

omissions that precludes the Court from finding that the ALJ's RFC error was harmless.[16] So the ALJ's decision should be remanded for further proceedings.

**Conclusion**

For the reasons explained above, I recommend that the Court reverse the Commissioner's decision and remand for proceedings consistent with this opinion.

Dated: January 18, 2023

                        */s/ James E. Grimes Jr.*
                        James E. Grimes Jr.
                        U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).

---

[16]    Briggs also challenges the ALJ's finding that the job "clergy member" was past relevant work. Doc. 8, at 15. Briggs points out that the ALJ misconstrued aspects of the vocational expert's testimony about that. *Id*. at 16–17. On remand, the ALJ will have an opportunity to revisit the issue.